IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Daniel A. Madero, et al., ) | |
| ) | |
| Plaintiffs, ) | Case No. 12 C 50157 |
| ) | |
| vs. ) | |
| ) | |
| Peters Engineering, Inc., et al., ) | Judge Philip G. Reinhard |
| ) | |
| Defendants. ) | |

## ORDER

For the reasons stated below, defendants' motion [116] for partial summary judgment is granted in part and denied in part. Summary judgment is granted on any IPWA claims plaintiffs are making for work performed by plaintiffs for PEI on jobs PEI performed for KDL Windstream in furtherance of KDL Windstream providing services to its customers pursuant to master services agreements (containing the provisions discussed above found in Dkt # 120-8 and 120-9 or provisions substantially similar thereto) that KDL Windstream entered with its customers. Defendants also are entitled to summary judgment on any IPWA claims plaintiffs are making for work performed by plaintiffs for PEI on jobs PEI performed for Comcast in furtherance of Comcast providing services to its customers pursuant to any agreement (containing the Terms discussed above found in Dkt # 131-4 pp. 31-35 or provisions substantially similar thereto) that Comcast entered with its customers. Otherwise, the motion for partial summary judgment is denied. The parties are ordered to contact Magistrate Judge Johnston within 28 days to arrange a settlement conference or mediation.

## STATEMENT - OPINION

Plaintiffs, Daniel Madero, John Buffo, Paul Crager, Adam Dezran, Jovani Dorta, Jeff Jaenecke, Jamie Martin II, Nathan Sebright, Joe Stubenrauch, Robert Thor II, Peter Walker, and Larry Winchester bring this action against defendants, Peters Engineering, Inc. ("PEI"), Dean A. Peters, and Joshua A. Peters alleging claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 et seq. (Count I), the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 et seq. (Count II)., and the Illinois Prevailing Wage Act ("IPWA"), 820 ILCS 130 et seq. (Count III). Madero also brings a claim of retaliation under the FLSA, 29 U.S.C. § 215(a)(3) (Count IV). The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a). Defendants move [116] for partial summary judgment. They seek summary judgment on plaintiffs' IPWA claims (Count III) and Madero's FLSA retaliation claim (Count IV). They also seek summary judgment as to all claims against Joshua Peters ("Josh").

1

"It is the policy of the State of Illinois that a wage of no less than the general prevailing hourly rate as paid for work of a similar character in the locality in which the work is performed, shall be paid to all laborers, workers and mechanics employed by or on behalf of any and all public bodies engaged in public works." 820 ILCS 130/1. "Any laborer, worker or mechanic employed by the contractor or by any sub-contractor under him who is paid for his services in a sum less than the stipulated rates for work" under a contract for public works "shall have a right of action for whatever difference there may be between the amount so paid, and the rates provided by the contract together with costs and such reasonable attorney's fees as shall be allowed by the court." 820 ILCS 130/11.

Plaintiffs are former employees of PEI. PEI installed fiber optic and coaxial cable. PEI performed this work under contracts with Comcast and KDL Windstream.[1] Plaintiffs claim that some of the jobs they worked on while employed by PEI were subject to the IPWA but that they were not paid the prevailing wage for this work. The work plaintiffs performed included aerial, underground, ground hand, splicing, and multi-dwelling unit work. In these positions plaintiffs performed various duties relating to the installation and connection of fiberoptic and coaxial cable in commercial buildings. Their duties included digging holes and installing utility poles; hanging, running and anchoring cable fiber on utility poles; digging trenches and constructing ducts in those trenches; pulling cable through the ducts using a boring machine; clearing brush and providing traffic control; creating points of entry in preexisting structures; splicing cable fiber; and pulling and running cable fiber into and through commercial buildings. Plaintiffs also dug trenches, exposed building foundations, and bored holes on public school property. Plaintiffs worked on school property and in school buildings of a number of Illinois school districts.

The IPWA "applies to the wages of laborers, mechanics and other workers employed in any public works, as hereinafter defined, by any public body and to anyone under contracts for public works." 820 ILCS 130/2. The IPWA defines "public body" to mean "the State or any officer, board, or commission of the State or any political subdivision or department thereof, or any institution supported in whole or in part by public funds, and includes every county, city, town, village, township, school district, irrigation, utility, reclamation improvement or other district and every other political subdivision, district or municipality of the state whether such political subdivision, municipality or district operates under special charter or not." Id. "Section 2 of the [IPWA] defines 'public works' as 'all fixed works constructed or demolished by any public body, or paid for wholly or in part out of public funds." 820 ILCS 130/2.[2]"

---

[1] The term "KDL Windstream" used herein includes the company Windstream Communications as well as Norlight, Inc., Norlight Telecommunications, Inc., Cinergy Communications and Kentucky Data Link. Windstream Communications has acquired all of these companies. The term "Comcast" also includes Insight Communications which sold its Illinois cable systems to Comcast in 2008.

[2] This language became effective January 1, 2010. Prior to that the provision provided: "Public works" means all fixed works constructed by any public body, other than work done directly by any public utility company, whether or not done under public supervision or direction, or paid for wholly or in part out of public funds. The amendment added "demolition" and moved the language exempting public utility companies to a separate sentence later in Section 2.

2

"Section 2 defines 'construction' as 'all work on public works involving laborers, workers or mechanics' including 'any maintenance, repair, assembly, or disassembly work performed on equipment whether owned, leased, or rented.'" Section 3 provides "[n]ot less than the general prevailing rate of hourly wages for work of a similar character on public works in the locality in which the work is performed, and not less than the general prevailing rate of hourly wages for legal holiday and overtime work, shall be paid all laborers, workers and mechanics employed by or on behalf of any public body engaged in the construction or demolition of public works. Only such laborers, workers and mechanics as are directly employed by contractors or subcontractors in actual construction work on the site of the building or construction job, and laborers, workers, and mechanics engaged in the transportation of materials and equipment to or from the site . . . shall be deemed to be employed upon public works.[3]" 820 ILCS 130/3.

Summary judgment is appropriate only if the evidence presented, taken most favorably to the non-moving party, reveals no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Goodman v. Nat'l Security Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010). "Evidence supporting or opposing summary judgment must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." Widmar v. Sun Chemical Corp., 772 F.3d 457, 460 (7th Cir. 2014). The "opponent of summary judgment need only point to evidence that can be put in admissible form at trial, and that, if believed by the fact-finder, could support judgment in his favor." Marr v. Bank of America, N.A., 662 F.963, 966 (7th Cir. 2011). The issue is whether plaintiffs have presented evidence that, if believed, shows they were engaged in the construction of public works– "fixed works constructed by any public body . . . or paid for wholly or in part out of public funds." 820 ILCS 130/2.

Plaintiffs worked for PEI on projects PEI did for KDL Windstream. These projects were related to certain KDL Windstream master services agreements it entered with its customers. Plaintiffs worked on projects for Comcast. These projects were related to certain Comcast service agreements it entered with its customers. Collectively, the court will refer, at times, to these KDL Windstream and Comcast customer agreements as the "Customer Contracts." Plaintiffs also claim to have worked for PEI on projects related to a contract KDL Windstream made with the State of Illinois. This contract was entered by Cinergy Communications and the state. The court will refer, at times, to this contract as the "State Contract." The court will address plaintiffs' claims for work on projects related to the Customer Contracts first. Those related to the State Contract will be discussed later.

Comcast and KDL Windstream are providers of cable and internet services. Looking to the Customer Contracts, the record contains master service agreements entered by KDL Windstream with public school districts in Illinois to provide cable and internet services to those districts. (Dkt # 120-8, 120-9) The terms of those agreements provide that the schools, as customers, are purchasing services from KDL Windstream. "Service" is defined as transmission capacity. The master service agreements provide that the term of the agreement is five years with automatic annual renewal thereafter unless prior notice of cancellation is given. As part of the agreement, the customers granted KDL Windstream "an irrevocable and indefeasible right to

---

[3] This language became effective January 1, 2010. The amendment added the word "demolition."

3

occupy, use and maintain however much space and power at each CUSTOMER Location as [KDL Windstream] reasonably desires to satisfy its obligations under this Agreement (the "Licensed Space"), for the term of this Agreement or any then-existing Service Order as long as such Service Order is in effect. From and after the date efforts to ready the Licensed Space for [KDL Windstream]'s occupancy are commenced, CUSTOMER may not relocate, or cause [KDL Windstream] to relocate any of [KDL Windstream]'s equipment or facilities from any CUSTOMER Location during the term. [KDL Windstream] and its affiliates shall have 24 hour/ 7 day per week unescorted access to such space, including any necessary easement and building entrance rights to extend [KDL Windstream]'s network from public rights of way into the CUSTOMER Location. No fees or charges shall be imposed on [KDL Windstream] in connection with, or related to, the License."

The master service agreements also provided that "[t]itle to [KDL Windstream]'s equipment and other facilities located in or at each CUSTOMER Location shall remain with [KDL Windstream] and its subtenants, sublicensees, successors and assigns, as applicable. From time to time throughout the term [KDL Windstream] may remove, or cause to be removed, from any CUSTOMER Location, any or all of [KDL Windstream]'s equipment or other facilities. Upon expiration or termination of the License, [KDL Windstream] shall remove, or cause to be removed, from each CUSTOMER Location, any and all of [KDL Windstream]'s equipment and other facilities. CUSTOMER hereby acknowledges and agrees that only [KDL Windstream] authorized personnel shall be allowed to access the [KDL Windstream] equipment and other facilities."

The agreements do not define "facilities." "[A]n undefined term in a contract will be given its plain and ordinary meaning, which is found in its standard dictionary definition." LaPort v. MB Financial Bank, N.A., 983 N.E.2d 1055, 1059 (Ill. App. 2012). The word "facility" is defined in the dictionary as "something that makes an action, operation, or course of conduct easier." "Something (as a hospital) that is built, installed, or established to serve a particular purpose." Merriam-Webster Online Dictionary (2015), available at http://www.merriam-webster.com/dictionary/facilities (last visited May 5, 2015). In the context of the master services agreements, the plain and ordinary meaning of "facilities" is those items "built, installed or established" by KDL Windstream in order to enable KDL Windstream to provide the services it was required to provide under the master services agreements. It is clear from these agreements that KDL Windstream was at all times the owner of everything that was installed on and in the customer's property and that it was the agreement of the parties to those agreements that what KDL Windstream installed, it would remove at the termination of the master service agreements and any service orders issued thereunder.

The record contains Comcast's Network services agreement with the Harlem School District dated March 21, 2011 for the provision of Ethernet Dedicated Internet Service. (Dkt # 131-4, pp. 29- 35) This agreement included "the standard Comcast Business Communications, LLC General Terms and Conditions ("Terms") (Dkt # 131-4 pp. 31-35)." The Terms provide that Comcast will provide "to Customer the Service" at prices and locations set forth in attached schedules. "The Service is provisioned by utilizing fiber optic cable, associated with electronics and other equipment ('Network'), which transports and distributes digital signals . . . to Customer's Building." "The Network is provisioned into Customer's Building at the point of

4

Interconnection between the Network and Customer's provided equipment located at Customer's Building ('Demarcation Point'). "The Service does not include connection . . . on the Customer's side of the Demarcation Point." The Terms provide the "Network is and shall remain the property of [Comcast] regardless of whether installed between, within or upon the Buildings and whether installed overhead, above, or underground and shall not be considered a fixture or an addition to the land or the Buildings located thereon. Customer agrees that it shall take no action that directly or indirectly impairs [Comcast]'s title to the Network." "Nothing in this Agreement shall preclude [Comcast] from using the Network for services provided to other [Comcast] customers." "For a period of twelve (12) months following [Comcast]'s discontinuance of Service to the Buildings, [Comcast] retains the right to remove the Network including, but not limited to, that portion of the Network that is located in the Buildings. To the extent [Comcast] removes such portion of the network, it shall be responsible for returning the Buildings to their prior condition, reasonable wear and tear excepted."

Under the Terms, "Customer, at no cost to [Comcast] shall secure throughout the term of Service any easements, leases, or other agreements necessary to allow [Comcast] to use existing pathways into and in each Building to the Demarcation Point for the Service." The term of the agreement is five years with automatic annual renewal thereafter unless prior notice of cancellation is given. The Terms provide that the Customer agrees to ensure that all uses of the Services installed at its premises are legal and appropriate. Comcast reserves the right to terminate or suspend the Service and or remove from the Service any information by or to Customer if it determines this requirement is not met.

The Terms make clear that Comcast, not the Customer was the owner of everything installed by Comcast on or in the customer's property and buildings. Everything in the Network was owned by Comcast and utilized for providing its services to the customers.

Plaintiffs argue PEI received public funds for these projects because Comcast and KDL Windstream passed on funds they received from the school boards to PEI for work on these projects. They contend this made PEI a public body. They also argue that if the school districts had contracted directly with PEI to install the fiber optic cable that PEI would have been subject to the IPWA and that the school districts, therefore, cannot circumvent the IPWA by contracting with private entities (KDL Windstream and Comcast) and having them in turn contract out the labor. Additionally, plaintiffs maintain PEI was subject to the IPWA because Comcast and KDL Windstream were public bodies because they were supported in whole or in part by public funds and PEI was a contractor of these public bodies. Even if KDL Windstream and Comcast were not public bodies, plaintiff argues PEI is subject to the IPWA because PEI was a subcontractor of Comcast and KDL Windstream which were under contract for public works and subcontractors of such contractors are also subject to the IPWA.

As to the Customer Contracts, It is apparent from the KDL Windstream master service agreements and the Comcast Terms, that they were not "engaged in the construction of public works." They were contracting to provide a service. The public entities with whom they contracted did not obtain an ownership interest in any of the items installed by Comcast or KDL Windstream. The master service agreements and the Terms explicitly provide that Comcast and KDL Windstream own the installed items and have the right to remove them. The master service agreements and the Terms specifically granted to Comcast and KDL Windstream licenses and or

5

easements to use space on or in the customers' property and buildings for locating the property of Comcast and KDL Windstream needed to provide services to the customers. The Comcast agreement expressly acknowledged Comcast's right to serve other customers with the Network located in the easement on the customer's property.

PEI contracted with Comcast to install the Network and KDL Windstream to install the equipment and facilities. Plaintiffs worked on these projects. Since these projects were done by PEI for Comcast and KDL Windstream, they were not public works and were not subject to the IPWA.

Plaintiffs argue that a construction invoice (Dkt 131-3, p.48) issued by Comcast to the McLean County School District with the project name "Sugar Creek Elementary Road Improvement" proves this project was covered by IPWA because this project was, according to Dean Peter's deposition testimony, a road widening project, and thus a public work. However, the invoice's project description reads "Sugar Elementary is undergoing a large addition to the existing location where it will require a pole line to be moved to accommodate new turn lanes and road widening. This will require Comcast to rebuild new facilities to a new pole line." Another invoice with the project name Sugar Creek School Fiber Relocation (Dkt 131-3, p. 45) clarifies what is going on with the project. Its project description reads "The customer is planning an extensive addition to an existing location where Comcast has existing fiber circuit at this location. Unit District No. 5 is requesting that Comcast relocate our fiber path to the building to accommodate the construction projects so as to not experience any outage from construction related activity. The new addition would place the new foundation over the top of the existing fiber route." It is evident from these project descriptions, that this work was on the Network as described in the Terms (as discussed above) and thus was work on the property of Comcast, not the school district. It was not a public work.

Plaintiffs also contend the holding in People, ex rel. Dept. of Labor v. Sackville Construction, Inc., 930 N.E.2d 1063 (Ill. App. 2010) compels a finding that Comcast and KDL Windstream were public bodies because they were publicly funded since they billed and were paid by the school districts. In Sackville, a private developer contracted with the city to build an industrial complex on city-owned land. The city agreed to convey title to the real estate to the developer for $1, to contribute $150,000 (10% of the construction cost) for site construction and to pay up to $57,000 for site clearance and demolition. Sackville held these contributions by the city to the developer made the developer a public body for purposes of the IPWA. Sackville is distinguishable because it involved simply a contribution by the city to the construction of the developer's complex. The funds were contributions to the developer not payments in conjunction with a service being provided to the city. A structure was being built and part of the funding for that structure came from the city's public funds. Here, payments to Comcast and KDL Windstream from the school districts were payments pursuant to service contracts. The payments only occurred in conjunction with the provision of the ongoing services and terminated when the services were no longer being provided. The cases in which non-governmental entities have been found to be supported by public funds deal with entities receiving funds by grant or appropriation or to provide services to the general public not in payment for services provided to the government entity. Id.; Opportunity Center of Southeastern Illinois v. Bernardi, 562 N.E.2d 1053 (Ill.App. 1990) (received one-half its funding from public funds to provide programs for

handicapped and developmentally disabled adults); People ex rel. Bernardi v. Illini Community Hosp., 516 N.E.2d 1320, 1321 (Ill. App. 1987) received tax revenues collected for its benefit). KDL Windstream and Comcast were not "institution[s] supported in whole or in part by public funds" and , therefore, were not public bodies. Accordingly, PEI was not under contract with a public body under its contracts with Comcast and KDL Windstream.

Plaintiffs also maintain PEI is a public body but the above discussion also shows this not to be the case. The only possible way PEI could have been considered a public body was if it had been an "institution supported in whole or in part by public funds." Plaintiffs contend PEI was such an institution because it got paid by Comcast and KDL Windstream with funds they received from public bodies. But, as noted above, the payments from the governmental entities to Comcast and KDL Windstream were payments for services. Comcast and KDL Windstream did not become "institution[s] supported in whole or in part by public funds" by receiving these payments. Likewise, PEI did not become such an institution when it got paid by Comcast and KDL Windstream for work on their service projects. PEI was not a public body.

Based on the foregoing, work performed on projects related to the Customer Contracts was not subject to the IPWA. Defendants are entitled to summary judgment on any claims plaintiffs are making for work performed by plaintiffs for PEI on jobs PEI performed for KDL Windstream in furtherance of KDL Windstream providing services to its customers pursuant to master services agreements (containing the provisions discussed above found in Dkt # 120-8 and 120-9 or provisions substantially similar thereto) that KDL Windstream entered with its customers. Defendants also are entitled to summary judgment on any claims plaintiffs are making for work performed by plaintiffs for PEI on jobs PEI performed for Comcast in furtherance of Comcast providing services to its customers pursuant to any agreement (containing the Terms discussed above found in Dkt # 131-4 pp. 31-35 or provisions substantially similar thereto) that Comcast entered with its customers.

The court next looks to the State Contract. The record contains a contract between Cinergy Communications and the State of Illinois. (Dkt # 131-4, pp.48-63) as well as a renewal of that contract between the State of Illinois and "Windstream (formerly Cinergy)" (Dkt # 131-4, pp. 38-47). In the contract's "description of supplies and services" section, paragraph 2.1 states: "the Illinois Department of Central Management Services (CMS) is establishing a contract for the purchase of maintaining and upgrading the State's high-speed telecommunications network to be up to task per our legislative mandate for the K-20 environment as well as to maintain high-speed connectivity for agency to agency and agency to CMS communications." Paragraph 2.2 states: "The goal is to enable CMS to acquire high speed, diverse connectivity between the sites identified in Attachment A and to ensure the ability to upgrade these circuits in the future if warranted." The contract provides for a 36 month term and provides for the payment of monthly service fees and an initial non-recurring service fee "for each service identified above." (Paragraph 3.7). The services "identified above" are five circuits. (Paragraph 3). Paragraph 2.8 states "the Parties agree that Vendor is not providing the State any supplies under this Contract."

This contract is, at least in part, a service contract. However, unlike Customer Contracts discussed above, this contract does not clearly provide that ownership of the network being constructed by the vendor is the property of the vendor. Paragraph 4.6 provides "All work performed . . . created by Vendor under this Contract, whether written documents or data, goods

or deliverables of any kind, shall be deemed work-for-hire under copyright law and all intellectual property and other laws and the State of Illinois is granted sole and exclusive ownership to all such work, unless otherwise agreed hereunder. Vendor hereby assigns to the State all right, title, and interest in and to such work including any related property rights and/or waives any and all claims that Vendor may have to such work including any so-called 'moral rights' in connection with the work." While this language appears to be primarily concerned with intellectual property rights, it could fairly be read to grant the State "sole and exclusive ownership" of all work performed, encompassing the infrastructure constructed to provide the services. A genuine issue of material fact exists as to whether the State is the owner of infrastructure installed by KDL Windstream under this contract and thus whether this contract was for the construction of public works. If it was, a genuine issue of material fact exists as to whether PEI was a subcontractor of KDL Windstream under this contract and, therefore, subject to the IPWA for worked performed in furtherance of KDL Windstream's performance under the contract.

Defendants contend plaintiffs have presented no evidence that any of them performed any work related to this contract between KDL Windstream and the State. It is undisputed that plaintiffs, Thor, Madero and Martin performed work for PEI at Western Illinois University on July 23, 2009 and that plaintiff Crager's "Daily Production Report" for June 11, 2009 lists 200 S. Wyman and Boone Co. Schools as "JOB Site." It is also undisputed that plaintiff Buffo's production report for April 9, 2010 lists 200 S. Wyman St. as "JOB Site." Western Illinois University and the State of Illinois Building located at 200 S. Wyman Street, Rockford, Illinois, are both site locations identified in this contract. Drawing all inferences from this evidence in favor of plaintiffs, a genuine issue of material fact exists as to whether Thor, Madero, Martin, Crager, and Buffo performed this work for PEI as a subcontractor of KDL Windstream in furtherance of KDL Windstream's performance under the contract.

Defendants seek summary judgment on Madero's FLSA retaliation claim set forth in Count IV. The FLSA provides that it is unlawful for any person "to discharge or in any other manner discriminate against an employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related [the FLSA]." 29 U.S.C. § 215(a)(3). Madero claims defendants discharged him because he filed this case, which includes a claim for failing to pay overtime rates as required by 29 U.S.C. § 207. Defendants contend Madero has failed to establish a prima facie case of retaliation because he cannot demonstrate a causal connection between his filing of this lawsuit and the termination of his employment. They also maintain he cannot show the non-retaliatory reason given for his termination – the need to reduce costs due to insufficient work – was a pretext.

In order to withstand a motion for summary judgment, Madero may proceed under either the direct method or the indirect method to establish a prima facie case of retaliation under the FLSA. Kasten v. Saint-Gobain Performance Plastics Corp., 703 F.3d 966, 972 (7th Cir. 2012). Madero is proceeding under the direct method. Under the direct method, he "must show: (1) that he engaged in protected expression; (2) that he suffered an adverse employment action; and (3) that a causal link existed between the protected expression and the adverse action." Id. Under the direct method, he "may rely on either direct evidence of a causal link or circumstantial evidence that is relevant and probative on any of the elements of a direct case of retaliation." Id.

8

Madero clearly engaged in protected expression by filing this lawsuit claiming a violation of the FLSA's overtime provisions and he clearly suffered an adverse employment action when his employment was terminated. Only the existence of a causal link is in dispute.

In a declaration dated November 26, 2012, and filed with the court on September 30, 2013 (Dkt # 59-1 pp. 9-10) Madero stated: "On September 17, 2012, Dean and Josh Peters told me they were laying me off because they did not have enough work for me. They also said that they did not have money to pay me because they had to defend this lawsuit." Later, on September 24, 2014, Madero testified in his deposition that "[w]hen they fired me they told me the reason for firing me was because they no longer could pay for me to be employed there because of the lawsuit that was going on." (Dkt # 131-2, p.67; Dep. P. 80). Dean testified in his deposition that he told Madero at the time he laid him off that "we were low on funds and having to deal with the lawsuit, we couldn't afford to keep him." (Dkt # 131-1, p. 76; Dep. P. 160). Defendants argue this statement made by Dean shows defendants were motivated by financial concerns not retaliation and that the fact Madero was terminated in September 2012, four months after the lawsuit was filed, makes the termination too remote from the protected activity to be considered retaliatory.

"The mere passage of time is not legally conclusive proof against retaliation." Malin v. Hospira, Inc., 762 F.3d 552, 559 (7th Cir. 2014) (internal quotation marks and citations omitted.) Here, Dean specifically mentioned the lawsuit at the time he terminated Madero and gave "having to deal with the lawsuit" as a reason PEI "couldn't afford to keep [Madero]." While it is certainly plausible financial constraints would have led to Madero's lay-off without him taking the protected action of filing the lawsuit, it is also plausible (particularly in light of Dean's statement to Madero) that Madero was laid-off in retaliation for filing the suit which required defendants to "deal with the lawsuit" and its financial as well as other consequences. See Egan v. Freedom Bank, 659 F.3d 639 (7th Cir. 2011). Summary judgment on Madero's FLSA retaliation claim must be denied.

Defendants argue Josh is entitled to summary judgment on all counts because he is not an employer as defined in the FLSA. The FLSA includes within the definition of "employer" "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The IMWL has a similar definition of "employer" including within the definition "any person or group of persons acting directly or indirectly in the interest of an employer." 820 ILCS 105/3(c). The IMWL and FLSA parallel each other and the same analysis generally applies to both. Morgan v. Speakeasy, LLC, 625 F.Supp. 2d 632, 650 (N.D. Ill. 2007) (Nolan, Mag.J.). A person who uses his authority over employees to violate their rights under the FLSA is subject to liability under the FLSA. Luder v. Endicott, 253 F.3d 1020, 1023 (7th Cir. 2001). Courts have considered certain factors in analyzing whether a person is an employer under FLSA. Arteaga v. Lynch, No. 10 C 1444, 2013 WL 5408580, *13 (N.D. Ill. Sept. 26, 2013) (Pallmeyer, J.). Factors considered include " whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. (internal quotation marks and citations omitted.) No one factor is dispositive. Id. Rather, the "court considers the totality of the circumstances that underscore the economic reality of the employment relationship." Id.

9

Dean is the president of PEI and is the majority shareholder. Josh is the vice president and a shareholder of PEI. Josh's initial capital contribution at formation of PEI gave him a forty percent ownership interest. Josh has signature authority on PEI's checking account and has authority to sign employee payroll checks. Dean testified in his deposition that Josh shares in the day-to-day operations of the company. Josh can make recommendations, which Dean takes seriously, about whether to hire or fire an employee and how to pay an employee. Josh directs and supervises the work of employees.

Madero testified Josh set his pay rate. Josh told Madero he was going to be paid $17 per hour. Madero objected and Josh said: "Okay. We'll pay you $18 an hour instead of $17 an hour." (Dkt # 131-2, p.66). Otherwise, the record does not show Josh determined the rate or method of employee pay but it shows he had input, which Dean took seriously, on these issues. The record shows Madero believed PEI switched its compensation policies to pay all employees on an hourly basis because Josh wanted that change. His reason for believing this is that when Dean said he was not going to "switch us to hourly" Josh "punched a hole through the door. Dean and Josh went back and had a conversation. Two weeks later we're on hourly." (Dkt # 131-2, p.32.). In meetings, which Dean also attended, Josh told Madero that Madero was being terminated and terminated another plaintiff, Sebright.

The record presented does not indicate Josh maintained employment records. Plaintiffs suggest the fact Josh's name was written on the "Supervisor" line on the weekly reports prepared by plaintiffs is an indication Josh "had a hand in processing and maintaining employment records." This is mere speculation.

While the evidence presented in the summary judgment record is not particularly strong in supporting plaintiffs' claim that Josh is an employer, there is some evidence to support this claim. The court denies defendants' motion for summary judgment as to Josh.

For the foregoing reasons, defendants' motion [116] for partial summary judgment is granted in part and denied in part. Summary judgment is granted on any IPWA claims plaintiffs are making for work performed by plaintiffs for PEI on jobs PEI performed for KDL Windstream in furtherance of KDL Windstream providing services to its customers pursuant to master services agreements (containing the provisions discussed above found in Dkt # 120-8 and 120-9 or provisions substantially similar thereto) that KDL Windstream entered with its customers. Defendants also are entitled to summary judgment on any IPWA claims plaintiffs are making for work performed by plaintiffs for PEI on jobs PEI performed for Comcast in furtherance of Comcast providing services to its customers pursuant to any agreement (containing the Terms discussed above found in Dkt # 131-4 pp. 31-35 or provisions substantially similar thereto) that Comcast entered with its customers. Otherwise, the motion for partial summary judgment is denied. The parties are ordered to contact Magistrate Judge Johnston within 28 days to arrange a settlement conference or mediation.

Date: 5/12/2015

ENTER:

*Philip G. Reinhard*

United States District Court Judge

Electronic Notices. (LC)